# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

|  |  |
|---|---|
| TABITHA DAY, Mother of minor child, E.D., | No. C19-137-LTS |
| Plaintiff, |  |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| CEDAR RAPIDS COMMUNITY SCHOOL DISTRICT, et al., |  |
| Defendants. |  |

## I.    *INTRODUCTION AND PROCEDURAL HISTORY*

This case involves judicial review of a due process administrative decision under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq. Plaintiff Tabitha Day, on behalf of her daughter, E.D., originally brought a due process complaint before the Iowa Department of Education (the Department) against defendants Cedar Rapids Community School District (the District) and Grant Wood Area Education Agency (AEA). Day argued that the defendants denied E.D. a free and appropriate public education (FAPE) under the IDEA. An administrative law judge (ALJ) ultimately issued a decision finding that defendants did not deny a FAPE to E.D.

Day then filed a pro se complaint (Doc. 5) in this court. In addition to appealing from the ALJs' decision, the complaint also asserted claims under 42 U.S.C. § 1983, the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act of 1973 (Section 504), Titles VI and VII (Titles VI and VII) of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972 (Title IX), the Patient Protection and Affordable Care Act (ACA) and IDEA. *See* Docs. 5, 5-1. On February 26, 2020, defendants filed a motion (Doc. 7) to dismiss, which I granted in part and denied in part. I granted the motion as to the section 1983 claims and claims under Titles VI and VII. I

denied the motion as to all other claims, which remain pending. *See* Doc. 8.

At a subsequent scheduling conference, the parties agreed to brief the judicial review action prior to discovery on Day's other substantive claims. *See* Docs. 18, 19. After some initial unresponsiveness,[1] Day filed her merits brief (Doc. 31) and supporting exhibits on July 1, 2021, and defendants filed a response (Doc. 32) on July 20, 2021. Day did not file a reply. Defendants have also submitted the administrative record (Doc. 20). I find oral argument is not necessary. *See* Local Rule 7(c).

## II.    *FACTUAL BACKGROUND*[2]

Day filed her administrative due process complaint on E.D.'s behalf on November 9, 2018. Day invoked E.D.'s "stay put" rights[3] but the ALJ denied the request for a stay put order on February 15, 2019. The due process hearing took place on April 15 and 16, 2019. Day was represented by an attorney and testified at the hearing. She also presented testimony from Dr. Michael Ciliberto (E.D.'s neurologist), Dr. Shlomo Shinnar (expert witness), Courtney Hoffman (previous teacher for E.D.) and Sara Cain (parent educator coordinator for the AEA). The District and AEA presented testimony from Sandra Byard (health services facilitator for the District), Erin Lemieux (school

---

[1] Defendants sought to dismiss this case for failure to prosecute after Day missed a briefing deadline, a subsequent scheduling conference and an extended briefing deadline. *See* Doc. 25. I entered an order on May 6, 2021, giving Day a final opportunity to respond and take action in her case. She filed a response (Doc. 27) and later filed a brief (Doc. 31) pursuant to a new briefing schedule. As such, defendants' motion (Doc. 25) to dismiss will be denied as moot.

[2] While defendants are correct that Day did not challenge the ALJ's fact-finding in her brief, she did so in her complaint. *See* Doc. 5 at 5, 8. I have reviewed the record from the due process hearing, as well as the additional exhibits (Doc. 31-1) Day submitted with her merits brief, and find that the record supports the ALJ's factual findings, except as otherwise noted in this order. Much of the factual background summarized herein comes from the ALJ's decision.

[3] The "stay put" provision of the IDEA requires that a child remain in the then-current educational placement during the pendency of a due process proceeding. *See* 20 U.S.C. § 1415(j).

nurse in the District), Wendy Parker (executive director for special services for Cedar Rapids Schools), Cindy Fagan (school nurse), Dawn Embretson (associate director of special services for the Cedar Rapids Community Schools) and Stephen Probert (principal of Hiawatha Elementary). The ALJ admitted Day's exhibits A through AS and defendants' exhibits 7 through 31. The parties submitted post-hearing briefs, *see* Doc. 20-4 at 95-125; 126-167; 171-82; 183-98, and the ALJ then issued his decision on September 13, 2019, concluding there was no procedural violation of the IDEA and that E.D. had not been denied a FAPE. Doc. 20-4 at 202-21.

At the time of the due process complaint, E.D. was 11 years old, living within the District and enrolled at Hiawatha Elementary School. Prior to the 2018-19 school year, she had attended Truman Elementary. She has been diagnosed with Lennox-Gastaut Syndrome (an intractable form of epilepsy), asthma, impaired mobility and developmental delays. She is prone to having absence, cluster and tonic-clonic (grand mal) seizures.

E.D. has had an Individualized Education Plan (IEP) since she began attending school in the District in 2010. The IEP was unchanged from May 2010 through the end of the 2017-18 school year, during which E.D. attended Truman Elementary. E.D. has also had an Individual Health Plan (IHP) since 2010. The IHP includes, among other things, an emergency protocol for dealing with epileptic seizures while in school, which is the focus of Day's complaint. Prior to the 2018-19 school year, this protocol provided that at the first sign of a seizure, staff would alert the health office, which would send health staff to E.D.'s classroom. E.D.'s vagus nerve stimulator (VNS)[4] magnet would be used to try to activate her device. This action could be repeated every minute for five minutes. If the seizure lasted more than five minutes, staff would administer Diastat. If the seizures continued for another five minutes, staff would call 911.

---

[4] E.D. had a VNS device implanted in her upper left chest in 2013 to prevent or lessen seizure activity. The device can be activated by swiping a magnet across the implant location.

During the 2014-15 school year, E.D. had Diastat administered three times at school by a teacher or paraprofessional. Staff also administered Diastat three times during the 2015-16 and 2016-17 school years and one time during the 2017-18 school year. Staff also administered Diastat once during the short time E.D. was at Hiawatha Elementary during the 2018-19 school year. After each of those 10 occasions, E.D. returned to her class after recovering from her seizure.[5]

E.D.'s most recent IEP is dated April 10, 2018, and refers to her IHP three times. *See* Doc. 20-3 at 153-80. This IEP was the result of an IEP meeting on January 4, 2018. The IEP discusses the protocol for responding to E.D.'s seizures and states: "Please refer to the IHP/Emergency Protocol." *Id.* at 155. It identifies Health Services and Nursing Services as related services. *Id.* at 166. Because E.D. had previously attended Truman Elementary before switching to Hiawatha Elementary for the 2018-19 school year, the Hiawatha Elementary school nurse, Cindy Fagan, was required to draft a new health plan. Fagan attempted to speak with Day about E.D.'s health services prior to the start of school but was unable to reach her by phone or leave a message. Fagan was able to speak with Day at an open house the day before the start of school and they discussed responses to E.D.'s seizures, including the use of Diastat. Fagan informed Day that the school's policy was to send students home after the administration of Diastat. Day expressed dissatisfaction with this and Fagan said she would speak with her supervisor.

Fagan then began drafting the emergency seizure protocol for E.D. She contacted the nurse for E.D.'s physician, Dr. Ciliberto, but did not receive a response until October 2018. Fagan sent a copy of E.D.'s IHP and emergency seizure protocol home in E.D.'s backpack after school started. The IHP stated:

> Once Diastat is given, mother will be notified and

---

[5] The ALJ found E.D. returned to her class after each occasion, but Day testified she was required to pick up E.D. from school on August 28, 2018, when she had her first seizure at Hiawatha that required the administration of Diastat. *See* Doc. 20-4 at 204; Doc. 20-5 at 114, 176, 195.

- A parent will come and will take the child home when it is safe for her to do so

- If unable to contact mother, then contact father.

- If unable to contact parents and 911 has been called, EMS will take over care of the child.

Doc. 20-3 at 203-04. The same procedure was included in E.D.'s emergency protocol for seizures.

Day disagreed with this new procedure. She added handwritten notes and suggestions on the IHP and returned it to the school nurse. In her notes, Day expressed dissatisfaction that the school was requiring this new procedure after eight years and that the procedure of observing the child for the next four hours after receiving Diastat had "nothing to do with her safety." Day refused to sign the document and spoke to E.D.'s teacher, the principal, the school nurse and Byard. Byard informed Day that this was policy. Day expressed confusion as to how it could be policy if it had not been included in E.D.'s IHP for the past eight years. *See* Doc. 20-5 at 175.

At all relevant times, Sandra Byard was the District's health services facilitator. She learned, through E.D.'s situation, that the District did not have a consistent procedure for treating children who had been administered Diastat. Rather, school nurses would exercise their judgment and discretion in determining whether children needed to go home after the administration of Diastat or could return to their classroom. Byard felt there needed to be a District-wide practice so she called an all-nurses meeting to address the issue. Byard and the nurses discussed similar policies, such as administration of an Epi pen, which required children to be sent home afterwards, and considered medical literature. Byard had also discussed the issue with other district health facilitators in the Urban Action Network (a group of the top 10 most populous school districts in the state) and learned that the consistent practice was to send children home after Diastat was

5

administered. The nurses agreed that children would leave school for the day after the administration of Diastat.[6]

The medical literature that Byard and the nurses relied on was a point of contention in the administrative proceeding. The first article Byard relied on was entitled "Evidence-Based Guideline: Treatment of Convulsive Status Epilepticus in Children and Adults: Report of the Guideline Committee of the American Epilepsy Society." The authors noted that after rectal administration of diazepam in children, respiratory depression was reported in five class III trials, ranging from 1.2 to 6.4 percent, while two class III trials and two class I trials, in acute repetitive seizures reported no incidence of respiratory depression with rectal diazepam use in children.

The second article, from the Epilepsy Foundation, stated that status epilepticus (a tonic-clonic seizure of five minutes or more) requires "emergency treatment by trained medical personnel in a hospital setting." It also stated: "medical treatment needs to be started as soon as possible" and "oxygen and other support for breathing, intravenous fluids . . . and emergency medication are needed." Byard believed that the adopted

---

[6] The timing of the all-nurses meeting and the adoption of the District-wide Diastat policy is somewhat ambiguous. Byard testified that she discovered the practice of sending children home after the administration of Diastat was inconsistent throughout the district "by being informed of [E.D.]'s situation" at which point she raised the issue at a nurses meeting. Doc. 20-5 at 213. *See also id.* at 313 (stating nurses' meeting was in September to discuss protocol for Diastat); 354 (same). Fagan testified that E.D. was part of a new program at Hiawatha Elementary that accepted students with severe disabilities. In speaking with Byard and other nurses, she understood that children were to be sent home after receiving Diastat at school. *Id.* at 385-86. It appears that Byard did not learn of the inconsistencies among the schools' approaches until Day raised the issue with respect to E.D., at which point she held the nurses' meeting. The ALJ suggested the "new Diastat protocol" was adopted prior to the school year or E.D.'s seizure. *See* Doc. 20-4 at 206 ("But, in August of 2018 after the new direction from Byard and the nurses, the IHP was amended to include the provision that the child's parent would be notified after Diastat is administered and the parent would take her home when it is safe for her to do so."). I agree that the record shows E.D.'s IHP was amended in August 2018 (which is consistent with Fagan's testimony that a new IHP was required because E.D. was attending a new school) but disagree that it was already a District-wide policy at that time. The record indicates that it did not become a District-wide policy until September 2018.

6

protocol was appropriate because schools are held to a higher standard of care than parents and schools were not equipped to provide mechanical ventilation.

On the third day of the school year, August 28, 2018, E.D. had a seizure at school that required the administration of Diastat. The school called Day and E.D. was sent home. Day did not return E.D. to school, stating she was concerned the school nurse would disregard the guidance of E.D.'s physician (who deemed it safe for E.D. to return to class) and that E.D.'s seizures had increased such that she was receiving Diastat a couple times per week.

The school convened a meeting on September 10, 2018, to discuss the issue. Day, Byard, Fagan, the school principal and E.D.'s special education teacher attended the meeting.[7] The school explained the policy to Day and Day provided her input – noting that E.D. had been experiencing increased seizures. Byard encouraged Day to return E.D. to school and promised to re-evaluate the situation and discuss alternative arrangements if E.D.'s need for Diastat at school increased. Other District personnel agreed with this approach. No one conditioned E.D.'s return to school on Day's approval of the IHP. The parties were unable to reach an agreement at this meeting.

Dr. Ciliberto wrote a letter dated October 16, 2018, listing recommendations for how to deal with E.D.'s seizures. He recommended that Diastat be given only if the seizure lasts longer than ten minutes and that 911 be called if the seizure lasts an additional five minutes after administration of Diastat. He opined there was no reason for E.D. to leave school after the administration of Diastat and that she should be able to return to school per her usual routine. Dr. Ciliberto testified consistent with his letter at the due

---

[7] The ALJ refers to this meeting as an IEP team meeting. Doc. 20-4 at 208. While all, or most, of the participants of the IEP team appeared to be present at this meeting, it is unclear whether the September 10, 2018, meeting was an "IEP team meeting" in the formal sense, which would require prior written notice. *See* 20 U.S.C. § 1415(b)(3), (c); Doc. 20-5 at 188 (Day testified that it was not an IEP meeting but a meeting solely to talk about the IHP). *See also* Doc. 20-3 at 153 (listing IEP team members as Day, a nurse, a special education teacher, a physical therapist, a general education teacher and LEA designee and a speech language pathologist).

7

process hearing. In the event of a seizure, he recommended giving first aid by moving E.D. to her side, getting her to a safe area and making sure there was nothing in her mouth. If the seizure continued for 10 minutes, he recommended administering Diastat. E.D.'s main side effect from a seizure and Diastat was fatigue. Generally, her seizures would stop within 10 minutes and the Diastat returned her to baseline more quickly.

Once at baseline, Dr. Ciliberto testified E.D. could resume all normal activities, including school. He would only have someone stay with a child after the administration of Diastat to observe if there were any side effects. He found no medical reason for E.D. to leave school after Diastat because E.D. would be medically safe and the medication tended not to impact her for long periods of time or affect her ability to participate. He would recommend calling 911 only if E.D.'s seizures continued five minutes after Diastat was administered.

With regard to the risk of respiratory depression, Dr. Ciliberto testified that it can happen to all epilepsy patients, regardless of the administration of Diastat. He noted that Diastat had not caused respiratory depression in E.D. and there was an "exceedingly low" chance she would ever have that issue. He was unaware of any circumstance in which E.D. had had a second seizure within four hours of receiving Diastat.

Dr. Shinnar, a neurologist and pediatrician at the Albert Einstein College of Medicine, whose research focuses on childhood seizures and status epilepticus, testified for Day as an expert. He explained that Diastat is the only drug approved for at-home use with prolonged seizures. It reduces the chance of another seizure and protects the person for some time afterwards. Respiratory depression is one possible side effect, but it is usually an effect of the seizure itself rather than Diastat. He testified that patients are safer after having received Diastat than they would be had they not received it. Dr. Shinnar noted that respiratory depression would be immediately apparent and would not come about hours later.

Dr. Shinnar reviewed E.D.'s medical history and concluded she was not likely to suffer from respiratory depression following the administration of Diastat because she

8

had tolerated it well in the past. He explained that past performance was a reliable predictor of the future. While it may take E.D. a while to "wake up" and recover after Diastat, he saw no chance of respiratory depression in the four-hour time frame after E.D. reached baseline. He found it acceptable for a child to return to class after Diastat had been given and the child woke up. He saw no logic in a four-hour exclusion from school and would recommend sending a child to the emergency room only if the seizure had not resolved within 30 minutes.

Courtney Hoffman also testified. She had received training on E.D.'s seizure protocol and both taught E.D. and provided respite care to her at ages three through seven. During that time, E.D. experienced frequent seizures and Hoffman sometimes administered Diastat every day. On one occasion, Diastat did not stop the seizure and the school called Day and 911. E.D. came out of the seizure by the time they reached the hospital. Hoffman testified that Diastat typically resolved a seizure within a minute. E.D. would then be tired, but within 30 minutes would be back to her usual activities. E.D. never had a second seizure after Diastat and did not require that her activities be limited afterwards. She never had respiratory depression.

While her due process complaint was pending, Day tracked E.D.'s seizures using an application called Seizuretracker. Between January 28, 2019, and April 17, 2019, she recorded 136 separate seizures. While the seizures happened throughout the day, the morning hours had the greatest activity. During this timeframe, Diastat was administered 41 times. Day testified Diastat is always effective in stopping a seizure and E.D. has never had another seizure within four hours of receiving it. Day has never taken E.D. to the hospital or called paramedics due to a seizure. E.D. can be tired after a seizure and will need to rest for up to 20 minutes, but will then be ready to resume her previous activities. Within 30 minutes, Day always sees E.D. return to her normal self. E.D. has had no adverse effect related to Diastat and has always responded positively to it.

9

### III. APPLICABLE STANDARDS

Under the IDEA, parents may file a due process complaint to challenge "the identification, evaluation, or educational placement of [their] child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A). Complaints are resolved by a due process hearing conducted by the state or local educational agency or, if desired by the interested parties, voluntary mediation. *Id.* § 1415(e)–(f). When no procedural violations are alleged, the purpose of the due process hearing is to determine whether the child received a FAPE. *Id.* § 1415(f)(3)(E)(i). The burden of proof falls on the party seeking relief. *Sneitzer v. Iowa Dep't of Educ.*, 796 F.3d 942, 948 (8th Cir. 2015).

A party may seek review of the administrative proceedings by bringing a civil action in state or federal court. *Id.* § 1415(g), (i)(2). A federal district court reviewing an agency decision under the IDEA must conduct a de novo review to determine whether the aggrieved party is entitled to relief based on a preponderance of the evidence. *Id.* § 1415(i)(2)(C)(iii); *I.Z.M. v. Rosemount-Apple Valley-Eagan Pub. Sch.*, 863 F.3d 966, 970 (8th Cir. 2017). However, the court must give "'due weight' to the outcome of the administrative proceedings." *Id.* (quoting *T.F. v. Special Sch. Dist. of St. Louis Cty.*, 449 F.3d 816, 818 (8th Cir. 2006)).

### IV. ANALYSIS

In her complaint, Day alleges the District amended E.D.'s IEP by changing the IHP that is incorporated into her IEP. Doc. 5 at 4. She states this change was made without consulting the IEP team, including herself. Day contends E.D. lost an entire year of school and has had regression in some areas. She further contends that the mental anguish and stress of this issue had a negative effect on Day such that she developed an infection that required hospitalization. *Id.* at 5. Day requests that the due process complaint be remanded to the ALJ to correct certain findings of fact. Specifically:

I want the State to remand the due process back to the ALJ because he had information in his findings of fact that are wrong and so wrong that if I was given the opportunity I could show with documentation within the submitted evidence and I could supplement more. He took the nurse and health facilitator at their word even over neurologist specializing in the field and the organizations stating they did not support what the school was doing like the Epilepsy Foundation in the evidence I provided they clearly state the school is wrong and misusing the information on their website. I feel that the documents and testimonies from my due process were not considered whatsoever. The school did not provide any valid reason for this policy and it is incorrectly assumed the notion that the IHP is not apart [sic] of the IEP in this case.

Doc. 5 at 5. Day seeks compensatory and punitive damages. *Id.*

In her merits brief, Day takes issue with the information the District relied upon to implement the emergency seizure protocol that was incorporated into the IHP. *See* Doc. 31. She contends the District's decision was not supported by adequate medical research and that expert evidence provided at the hearing established that there was no medical reason why E.D. could not stay in school after the administration of Diastat. She argues that such a policy is discriminatory towards children with epilepsy. She argues that because the IHP is part of the IEP, any changes to the IHP required an IEP meeting under the IDEA. *Id.*

Defendants correctly identify the two issues as: (1) whether there was a procedural violation of the IDEA in the creation of E.D.'s IHP, thereby denying E.D. a FAPE, and (2) whether, on a substantive basis, E.D. was denied a FAPE under the emergency seizure protocol requiring E.D. to return home after the administration of Diastat. I will consider each of these issues in turn.

### A.    *Procedural Violation of IDEA*

Day argues there was a procedural violation of the IDEA because Fagan altered the IHP without Day's consent and without an IEP meeting. Doc. 31. Day contends that the IHP is part of the IEP because, without it, the IEP does not meet the statutory

requirements and would violate E.D.'s right to a FAPE. Defendants do not dispute that the IHP becomes integrated into an IEP. However, they argue that the two documents are distinct and the ALJ correctly found that Day "was allowed to provide significant input into the contents of the IHP." Doc. 20-4 at 215.

The IDEA requires school districts receiving federal funds under the IDEA to provide all children with disabilities "a [FAPE] which emphasizes special education and related services designed to meet their unique needs [and] to assure that the rights of [such] children and their parents or guardians are protected." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239 (2009) (alteration in original) (quotation omitted). A FAPE "consists of education instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit from the instruction.'" *Parrish v. Bentonville Sch. Dist.*, 896 F.3d 889, 894 (8th Cir. 2018) (quoting *Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 188-89 (1982)). "Congress intended that IDEA's procedural safeguards be enforced so that parents of a handicapped child will have adequate input in the development of the child's IEP." *Indep. Sch. Dist. No 283 v. S.D. ex rel. J.D.*, 88 F.3d 556, 562 (8th Cir. 1996). An IEP is a "written statement for each child with a disability that is developed, reviewed, and revised in accordance with [20 U.S.C. § 1414] and that includes," among other things,

> a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child.

20 U.S.C. § 1414(d)(1)(A)(i)(IV). The procedural safeguards under the IDEA include parental notification of any proposed change to their child's IEP, that parents or guardian be permitted to participate in discussions related to their child's evaluation and education and that if parents are not satisfied with an IEP, they may request a due process hearing. *See M.P. ex rel. K. v. Indep. Sch. Dist. No. 721*, 326 F.3d 975, 979 (8th Cir. 2003)

12

(citing 20 U.S.C. § 1415). "An IEP should be set aside only if procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." *Lathrop R-II Sch. Dist. v. Gray ex rel. D.G.*, 611 F.3d 419, 424 (8th Cir. 2010) (quoting *Indep. Sch. Dist. No. 283*, 88 F.3d at 562).

The IDEA does not address IHPs. IHPs may apply to children with or without disabilities, and are covered by Iowa regulations, which define an IHP as:

> the confidential, written, preplanned and ongoing special health service in the educational program. It includes assessment, nursing diagnosis, outcomes, planning, interventions, evaluation, student goals, if applicable, and a plan for emergencies to provide direction in managing an individual's health needs. The plan is updated as needed and at least annually. Licensed health personnel develop this written plan with collaboration from the parent or guardian, individual's health care provider or education team.

281 IAC 14.2(1). School health services "must comply with any additional or differing requirements imposed by [the IDEA] based on a specific child's needs." 281 IAC 14.2(3). As explained by the ALJ:

> An IEP must contain, among other things, a statement of the related services and supplementary aids and services that will be provided in order to enable the child to be educated and participate with other disabled and non-disabled students. 281 IAC 41.320(1)(e). Related services are such "supportive services as are required to assist a child with a disability to benefit from special education" and include school health service and nurse services. 281 IAC 41.34(1). School health services and school nurse services are health services that are designed to enable a child with a disability to receive FAPE as described in the child's IEP. 281 IAC 41.34(m).

Doc. 20-4 at 213.

The ALJ relied, in part, on this distinction in his analysis of Day's complaint of a procedural violation of the IDEA:

> In particular, Complainant argues nursing services, just as other "related services" provided to a special education eligible student, are subject to the IDEA and special education regulations. As such, because the child's IHP was a part of her April 2018 IEP, it was her IEP team that was required to

13

have determined the content of the IHP. And, when changes were made to her IEP (through the IHP), the IEP team was required to have explained it and offered a prior written notice to the parent. Complainant also argues that as part of the IEP, the IHP can only be revised by the IEP team. Therefore, according to Complainant, it was a violation of the IDEA for the nurse to have revised the IHP without an IEP team meeting and without allowing meaningful involvement by the mother.

First, it is reasonable to conclude that the IHP is incorporated into or effectively made part of the IEP in that the contents of the IHP constitute related services and are uploaded into the Iowa IEP management system. *See* 281 IAC 14.2(2)(b)(4) (requiring "integration" of the IHP into the IEP). However, for something to be incorporated or integrated into something else, as here the IHP into the IEP, that new incorporated thing must have come from someplace else. As here, with the IHP, that "someplace else" must be the regulations that guide the drafting and content of the health plan.

The relevant regulations provide that an IHP is developed by a licensed health personnel in collaboration with the parent or guardian, individual's health care provider or education team. 281 IAC 14.2(1). In contrast, the IEP team generally must include the parents, a general education teacher, a special education teacher, a district representative, someone who can interpret evaluation results, and the child when appropriate. 34 CFR 300.321(a). Thus, a much smaller subset of what comprises the IEP team is authorized to develop the IHP.

Here, nurse Fagen [sic] drafted E.D.'s IPH [sic] and seizure protocol anew at the start of the 2018-2019 school year. Because this was the child's first time in this school and under the care of Fagen, this was a new experience and new document for her. Consequently, Fagen attempted to contact the mother before the start of the school year, however, she was unable to make contact. She then met with the mother at the open house before school started. They discussed various aspects of the child's health care, including the new Diastat protocol. The mother was able to express her opinion on this protocol.

Fagen then took some time to work on the health plan and provided a copy of the draft IHP, including the emergency protocol, by placing it in the child's backpack like she would normally do for other students. The mother reviewed this document and sent it back with a variety of suggestions, mark-

14

ups, and cross-outs. An IEP team meeting was subsequently called at which many team members, including the mother, discussed the Diastat protocol. Team members were not aggressive with the mother and they listened to her concerns, insisting they could revisit and re-evaluate the protocol if E.D. were to return to school and show an increased need for usage of Diasat [sic].

All of this illustrates that the mother was allowed to provide significant input into the contents of the IHP and that the school nurse and school and district personnel provided her many listening opportunities. However, because the child never returned to school after the third day of the school year, there never was opportunity to re-evaluate.

Likewise, the regulations setting forth the IHP requirement do not provide for any further formalized procedure for its development. This lack of formalized procedural requirement is in distinct contrast with the depth of regulation governing the formation of the IEP. These distinctions are significant. And, due to the IHP's own regulatory support and placement, and even though in this case, the IHP was incorporated by reference into E.D.'s IEP, it still retains its intrinsic nature and is guided by its own regulations. Those were followed here.

Iowa regulations also provide each board of a public school, in consultation with licensed health professionals, the authority to establish policy and guidelines for special health services. 281 IAC 14.2(2). This prerogative is not subject to the agreement of or consultation with any parent. This is also a recognition of the district or school's ability, in general, to institute policies or protocols of general applicability for special health situations. Here, it was decided that the schools did not have the capability to monitor and treat for potential respiratory depression following the administration of Diastat.

In light of all these considerations, it cannot be said that the Complainant's right to parental participation was impeded, that the child's right to FAPE was denied, or that there was a deprivation of any educational benefit by virtue of the processes undertaken. The school nurse, through a protocol proposed by the District's Health Services Facilitator, drafted the child's IHP in a manner with which the mother disagreed. The nurse sought and received input from the parent about the offending portion of the IHP. Iowa regulations envision and authorize such a change in a student's IHP. There was no requirement that an IEP team be convened and pass on a

15

modification to an IHP that is later integrated into the IEP. However, after the mother's concerns were heard, an IEP team meeting was promptly held on September 10 to discuss the Diastat protocol. The disagreement remained, and the mother chose to contest the matter through a Due Process complaint, as was her right.

Doc. 20-4 at 213-16.

While I disagree with some of the ALJ's factual findings, such as the timing of adoption of the District-wide protocol and the characterization of the September 10 meeting as an IEP team meeting, I agree with his analysis and conclusion. The IHP, as a separate document addressing the related health services under the IEP does not necessarily require an IEP meeting, but does require collaboration with the parent or guardian, individual's health care provider or education team. *See* 281 IAC 14.2(1). Day's complaint seems to be that there was no meaningful collaboration with her, as E.D.'s parent, before the new emergency seizure protocol was integrated into E.D.'s IEP through her IHP. While I agree that the initial communication with Day about the protocol was not ideal, the circumstances do not amount to a procedural violation of the IDEA.

The IHP is governed by Iowa law and regulations. While incorporated into the IEP, it is not necessarily part of the IEP such that it is subject to IDEA requirements. It is used to describe and provide greater detail about the health services identified as a related service in the IEP. This is not to say that a related service covered by an IHP never requires revision of a student's IEP. For example, in *E.I.H. v. Fair Lawn Bd. of Ed.*, 747 F. App'x 68, 72 (3d. Cir. 2018), the student's bus transportation to and from school was included in the IEP as a related service. After the student experienced a seizure and her doctor prescribed Diastat, her parents requested the district provide a health professional trained in the administration of Diastat on the student's bus. Rather than amending the student's IEP to include the nurse/aide requirement for transportation, the school amended her IHP to state: "[w]hile awaiting diagnostic information the district

16

is providing on the school bus a licensed medical professional to carry out medical orders regarding seizure medication." *Id.* at 69-70.

The ALJ concluded the service had to be included in the student's IEP. The district court disagreed, concluding it was not a "related service" necessary to enable a FAPE. The Third Circuit Court of Appeals reversed, agreeing with the ALJ that because bus transportation was already included in the student's IEP as a related service, and the student required a nurse on the bus in order to safely get to school in the event of a seizure, it stood to reason that "she would not be able to access her FAPE without the nurse." *Id.* at 73. As such, the nurse requirement had to be included in the student's IEP as opposed to her IHP. *Id.* This case demonstrates that I must consider whether the change reflects a change to the nature of the related service included in E.D.'s IEP.

E.D.'s IEP includes related services of "Health Services" and "Nursing Services." Doc. 20-3 at 166. Both of these sections provide that the time required for these services may vary from day to day because the student's health status and related needs may fluctuate. *Id.* The Health Services section says to "see IHP for details." *Id.* The Nursing Services section describes the services as "ongoing nursing assessment, diagnosis, planning, intervention, evaluation, consultation with health providers, staff, parents and emergency situations." *Id.* The IEP includes checked boxes for "health is a concern and will be addressed in this IEP" and "health is a concern and will be addressed in the Health Plan as a part of the student's health records." *Id.* at 154. It discusses her seizures, noting she occasionally requires the administration of rectal Diastat and states: "Please refer to the IHP/Emergency Protocol." *Id.* at 155.

The related services at issue (health and nursing services) are not fundamentally affected by the change in the emergency seizure protocol. The nature of the services provided remains substantially the same regarding how the school handles E.D.'s seizures. It is what happens after the administration of Diastat that is at issue. Day wants her daughter to stay in school while the school wants to err on the side of caution by

17

returning the student to his or her parent's care and ensure the student has access to necessary medical equipment in the event of respiratory depression.

I agree with the ALJ that the school is entitled to set guidelines and policy for its health services and Day has not demonstrated that the emergency protocol, at the time it was drafted for E.D., interfered with, or the school had reason to believe it would interfere with, E.D.'s right to a FAPE. E.D. had experienced, at most, three seizures requiring Diastat within a given school year. Because the emergency seizure protocol did not affect the nature of the related services described in the IEP, there was no procedural violation of the IDEA by revising E.D.'s IHP to include the emergency seizure protocol.

With regard to meaningful collaboration with Day, Fagan attempted to contact Day before school started but was unable to reach her or leave a message. Nor was Fagan able to connect with E.D.'s physician after Day expressed her dissatisfaction with the emergency seizure protocol. When Day received the draft IHP containing the emergency seizure protocol, as sent home in E.D.'s backpack, Day provided her input and comments both in writing and during discussions with E.D.'s teacher, the principal, Fagan and Byard. When Day did not return E.D. to school after she experienced a seizure requiring Diastat on August 28, 2018, the school convened a meeting on September 10, 2018, between Day, Byard, Fagan, the school principal and E.D.'s special education teacher.[8] Day voiced her concerns about the protocol at this meeting. While the school did not change the protocol, it took her concerns into consideration and offered a reasonable approach moving forward.

To the extent Day argues that failure to revise the protocol or IHP to her liking amounted to a procedural violation, I disagree. *See Blackmon ex rel. Blackmon v.*

---

[8] This group is different than E.D.'s IEP team. *See* Doc. 20-3 at 153 (listing persons present at the April 10, 2018 IEP meeting as Day, a nurse, a special education teacher, a physical therapist, a general education teacher and LEA designee and a speech language pathologist).

*Springfield R-XII Sch. Dist.*, 198 F.3d 648, 658-59 (8th Cir. 1999) ("the IDEA does not require school districts simply to accede to parents' demands without considering any suitable alternatives."). The IDEA provides that a parent may file a due process complaint when there is a disagreement, which is what Day did. *See* 20 U.S.C. § 1415; 34 C.F.R. § 300.507. The District sought Day's input and considered her comments about the protocol, as required under Iowa regulations.

Even if there was a procedural violation, it did not amount to a denial of a FAPE, seriously hamper Day's opportunity to participate in the formulation process of the IEP or cause a deprivation of educational benefits. *See Park Hill Sch. Dist. v. Dass*, 655 F.3d 762, 766 (8th Cir. 2011). Day had multiple opportunities to provide her comments on the emergency seizure protocol – both in writing and in person. As explained by the ALJ, the school convened a meeting when Day did not return E.D. to school following the seizure on August 28. It responded to Day's concerns of increased seizures by offering to revisit and re-evaluate the protocol if E.D. returned to school and showed an increased need for Diastat. However, Day chose not to return E.D. to school. It was not the protocol that resulted in E.D. missing school, but Day's own actions. There was no procedural violation that seriously hampered Day's opportunity to participate in the formulation process of the IEP, interfered with E.D.'s right to a FAPE or caused a deprivation of educational benefits. The ALJ's decision on this issue is affirmed.

**B.** **_Substantive Violation of IDEA_**

Day argues that the Diastat protocol was misinformed because there is no medical reason to have a child leave school following the administration of Diastat. Doc. 31. Day cites a letter she wrote to the school in opposition of the Diastat protocol and information from the Epilepsy Foundation website (Doc. 31-1), which she argues the school failed to consider. Day argues that the information she provided the school was met with silence and when she tried to figure out how to get E.D. back in school, she never received a response. Doc. 31.

19

Defendants argue the ALJ correctly concluded that the IDEA due process procedures could not be used to attack the District's generally applicable protocol and that the application of the protocol to E.D. did not deny her a FAPE. Defendants emphasize that at the time the IHP was integrated into E.D.'s IEP, it was objectively reasonable to believe that the Diastat protocol would not have a substantive effect on E.D.'s education. E.D. had been receiving Diastat between one and three times per school year during recent past years and defendants were not aware of an increased need for Diastat until later. When Day voiced her disagreement with the protocol, the District convened a meeting and explained that it was willing to re-evaluate the protocol as applied to E.D. if she experienced increased seizures at school. However, E.D. never returned to school after the September 10 meeting. Defendants argue the ALJ correctly concluded that E.D.'s absences from school were the result of Day's actions and choices, not those of the public agencies.

The ALJ concluded the District-wide protocol was not subject to challenge in the due process action and noted his review was "limited in scope to the impact of the protocol on the child's right to procedural protections and to receive FAPE." Doc. 20-4 at 216. He noted the relevant question was not "whether the IEP was prescient enough to know that the child's need for Diastat might increase, thus increasing her time away from school, but whether it was 'reasonably calculated' to provide an 'appropriate' education as defined in federal and state law." *Id.* (citing *Roland M. v. Concord School Committee*, 910 F.2d 983, 992 (1st Cir. 1990)). He focused on the "facts and circumstances known and confronted by the school and the district at the time the protocol was integrated into the child's IEP." *Id.* He explained that the IEP must be reviewed as a "snapshot," meaning he must take into account what was objectively reasonable at the time the IEP was promulgated and not what was reasonable in hindsight. *Id.* at 217 (citing cases). He concluded:

> [A]t the time Byard and the nurses agreed on a District-wide protocol requiring the child to be sent home following the administration of Diastat,

the decision that there was an increased need for observation of such children due to the fear of respiratory depression was a reasoned and rational reading of the literature from certain mainstream and credible organizations who deal with epilepsy.

*Id.*

The ALJ discussed the following in support:

- The American Epilepsy Society Report – documenting studies that showed some degree of respiratory depression after rectal administration of diazepam

- Epilepsy Foundation literature – describing emergency medical treatment required for status epilepticus

- Diastat packaging instructions – advising to stay with person for 4 hours and note any changes in breathing rate, color and possible side effects from treatment

- Dr. Shinnar and Dr. Ciliberto's testimony at the hearing that respiratory depression is one possible side effect of Diastat.

*Id.* The ALJ then analyzed the issue as follows:

Respiratory depression is a serious condition for which teachers and nurses in a school setting are simply not equipped to deal with. Most importantly, they cannot provide mechanical ventilation to such children. Teachers and para-educators are not medically trained and have no expertise or knowledge about treatment for or response to respiratory depression. By requiring a child to leave school after Diastat, then it would allow the parent to seek whatever care or monitoring they believe would best address that possibility, whether that be by the parents themselves or by some other medically trained person. The studies noted in the American Epilepsy Society's report showing some respiratory depression certainly warranted the attention of the District nursing personnel as it is their duty to promote and protect the health of the student population and to oversee health policies. This is also the reason the District policy is to always call 911 to get EMS personnel when a seizure lasts five minutes and Diastat is given.

Also, although initially unknown to Byard and the other District nurses, other district health facilitators in the Urban Action Network, a group of the ten most populous school districts in the state all follow the consistent

21

practice of sending children home after Diastat has been given. This protocol is therefore far from the outlier, and it appears to be consistently applied across the state. This was even apparently the practice at some of the Byard's own district schools based on decision by the specific school nurses. Byard and those nurses at some point made the decision to formalize that practice District-wide.

Furthermore, at the time the child's new IHP was implemented and integrated into her IEP, it was entirely reasonable and effectively was tailored to her unique situation and needs. In this regard, it is undisputed that from the 2014-2015 school year to the time she stopped attending school, the child had had Diastat administered at school a total of eleven times, or a little over two times per year. She has never had to receive it more than three times in a given year during that span. Thus, had her trend of four-plus years continued – and at the time of the amended IHP there was no reason to believe it would not have continued – then the child stood to have missed only a negligible amount of school. Had this continued, the relatively insubstantial amount of absences from school would have been unlikely to affect the child's learning experience in any substantial way. This was the information which was known to the District at the time it implemented the protocol and effectively made it a part of the child's IEP.

While the mother would later start tracking the child's seizures and Diastat usage, that information was not made available to the District until the Due Process Hearing. There would have been no way for the District to have known the extent to which her Diastat intake would have increased to such a degree without this information. Indeed, the District on several occasions informed the mother that were she to send the child back to school and it turned out that she would have to miss any more time under this new protocol, then its application to her would be reconsidered and perhaps a new plan implemented that would be more responsive and tailored to her situation. However, the mother refused to consider providing this information to the school or to send her back such that the school itself could have made its own informed determination as to the child's current situation.

Thus, at the time the IHP and emergency protocol were integrated into the IEP, the IEP was objectively reasonable and would have served fully to provide for the child's educational needs and her health needs. This reasoned decision was based on a justifiable reading of medical literature and authoritative guidance from knowledgeable and relevant groups. It was

also based on a reasoned reliance on the child's historical need for Diastat while at school in assessing the extent to which she would miss school and educational opportunities.

And, importantly, at that time the district did not have the benefit of Dr. Ciliberto's letter of October 2018 providing recommendations for how to deal with the child's seizures. It did not have the benefit of knowing how substantially the child's needs for Diastat might increase during the school year. It also did not have the benefit of Dr. Shinnar's testimony at hearing to the effect that any respiratory depression would be immediately apparent and that it almost certainly will not happen after they wake up following Diastat.

Regardless of this conclusion, the mother was not justified, and acted unreasonably, in refusing to send the child to school after her first in-school seizure that required the administration of Diastat during the 2018 school year. This deprived the District of knowledge of the extent of any increase on the child's need for Diastat and the amount of school time she would miss. It also deprived it of the opportunity to revisit the policy, as applied to the child, based on that new information. In this regard, many persons assured the mother that the District would have considered alternatives to sending the child home after Diastat if her need for Diastat was proven to have increased. All District personnel were likewise encouraging of the child's return to school at all times. Therefore, none of the child's absence from school during the 2018-2019 school year can be attributable to the District or the school.

Moreover, there could have been no safety or health concern because, in fact, the new policy was more conservative and provided for more potential observation of or care for the child than would have been provided under the mother's preferred policy. Any concerns that because of this, the nurses might be disposed to disregard other doctor's orders or other medical issues, it likewise overblown and not justification to refuse schooling. This was a District-wide protocol that was applied in an even-handed fashion to all and that in fact appeared to fit the unique circumstances of this child at the time it was applied.

Certainly, though, as was made clear by the evidence introduced at hearing, the child's circumstances have changed since the time her mother withheld her from school. Based on the chart of Diastat administration that was compiled on Seizuretracker.com in anticipation of the Due Process hearing,

the child actually would have been forced to miss a significant amount of school under the new protocol. In fact, between January 28, 2019, and April 17, 2019, the child received Diastat 41 times. While some of those incidents occurred in the late afternoon or evening hours, a good portion of them would have occurred during a time in which school was in session. Had the child's mother not withheld her from school and only produced this information at the time of the Due Process hearing, this case may have been entirely different.

Likewise, had the District been made aware of the information from Dr. Ciliberto and Dr. Shinnar at the time the protocol was integrated into the IEP, this may have been much different. Specifically, Dr. Shinnar expressed the medical opinion that E.D. is not likely to suffer from respiratory depression following the administration of Diastat because she has tolerated it well in the past. In this regard, past performance is a reliable predictor of the future. However, again, this was not information known to the school or its nursing staff.

Doc. 20-4 at 217-220.

I agree with the ALJ's reasoning. At the time the IHP and emergency protocol were integrated into E.D.'s IEP, defendants had no reason to believe it would interfere with E.D.'s right to a FAPE. E.D. had experienced, at most, three seizures in a given school year preceding her time at Hiawatha Elementary. When Day expressed her thoughts on the new protocol, staff offered to reevaluate how the new protocol would apply to E.D. if she required Diastat more frequently than she had in the past.

The Eighth Circuit has recently explained:

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017). "The Act contemplates that this fact-intensive exercise will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians." *Id.* "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.*

*Albright as Next Friend of Doe v. Mountain Home Sch. Dist.*, 926 F.3d 942, 948 (8th Cir. 2019). "An IEP is a snapshot, not a retrospective" meaning the court must "take

into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated." *K.E. ex rel. K.E. v. Independent Sch. Dist. No. 15*, 647 F.3d 795, 808 (8th Cir. 2011) (quoting *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990)). To the extent the emergency seizure protocol can be interpreted as part of E.D.'s IEP, the school took a reasonable approach to Day's concerns that E.D. was having more frequent seizures by offering to revisit how the protocol applied to E.D. based on whether she did experience increased seizures at school that required the administration of Diastat. As the ALJ noted, it would be inappropriate to find a substantive violation based on speculation as to how the protocol could have affected E.D.'s right to a FAPE when the information that existed at the time the IHP and emergency protocol were drafted was that she experienced, at most, three seizures, during a given school year. I agree with the ALJ that the District's emergency seizure protocol was not a substantive violation of the IDEA.

## C.    *Plaintiff's Remaining Claims*

Defendants argue that Day's remaining claims (violations of the ADA, Section 504, Title IX, and the ACA) should be dismissed if the administrative decision is upheld on judicial review under the IDEA. *See* Doc. 32 at 11 (citing *Ind. Sch. Dist. No. 283 v. S.D.*, 88 F.3d 556, 562 (8th Cir. 1996)). Even if not dismissed on those grounds, defendants argue Day fails to state a claim because the complaint does not allege any facts to indicate E.D. was discriminated against on the basis of sex as required to establish a Title IX violation or that there was disability or any other type of discrimination as part of a "health program or activity" in order to establish a private cause of action under the ACA. They argue that all allegations raised in the complaint are fully addressed by resolution of the judicial review action.

Day alleges that the District-wide protocol was created after her refusal to accept it as part of E.D.'s IHP and that its creation was "based in retaliation for standing up for my daughter[']s right to participate in a free appropriate public education." Doc. 5 at 7.

25

She argues it is discriminatory in violation of Title II of the ADA and Section 504 because it targets students with epilepsy and is not medically necessary, at least as it applies to E.D. *Id.*

In *S.D.*, the student and her parents requested an administrative hearing under the IDEA based on the school's refusal to reimburse S.D. for private school tuition. *S.D.*, 88 F.3d at 558. The hearing review officer granted S.D. relief and the school district sought judicial review in federal court, at which point S.D asserted counterclaims and cross-claims under state and federal laws. *Id.* The district court granted judgment on the administrative record in favor of the school district, finding it had substantially complied with IDEA's procedural requirements and provided S.D. a FAPE. *Id.* It dismissed the remaining claims as precluded by the judgment. *Id.* The Eighth Circuit affirmed on appeal, finding that the non-IDEA claims were precluded by the IDEA judgment in the school district's favor. *Id.* at 562.

I agree with defendants that Day's remaining claims of violations of the ADA, Section 504, Title IX and the ACA are either (1) precluded by resolution of her IDEA claim on judicial review or (2) fail to state any claim upon which relief may be granted. Beginning with the ADA and Section 504 claims, "Title II of the ADA prohibits public entities from discriminating based on disability in services, programs, or activities," while "Section 504 of the Rehabilitation Act provides that '[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'" *I.Z.M.*, 863 F.3d at 972 (citing 42 U.S.C. § 12132 and 29 U.S.C. § 794(a)). ADA and Section 504 claims require that a plaintiff show more than a mere violation of the IDEA. *See Monahan v. State of Neb.*, 687 F.2d 1164, 1170 (8th Cir. 1982) (noting the language of Section 504 prohibits exclusion, denial of benefits, and discrimination "solely by reason of . . . handicap" and that in order to show a violation of the Rehabilitation Act, something more than a mere failure to provide a FAPE must be shown); *Pottgen v. Mo. State High Sch.*

26

*Activities Ass'n*, 40 F.3d 926, 930 (8th Cir. 1994) ("Enforcement remedies, procedures and rights under Title II are the same as under section 504."). Preclusion applies if "resolution of the IDEA claims necessarily resolved" the non-IDEA claims. *I.Z.M.*, 863 F.3d at 972 (quoting *S.D.*, 88 F.3d at 562). If a student's Section 504 and ADA claims of unlawful discrimination are "wholly unrelated to the IEP process" they are not precluded. *Id.* (quoting *M.P. ex re. K & D.P. v. Indep. Sch. Dist. No. 721*, 439 F.3d 865, 868 (8th Cir. 2006)).

In *I.Z.M.*, the Eighth Circuit found that the student's Section 504 and ADA claims were precluded because they "all grew out of or were intertwined with allegations that the District failed to properly implement his IEP, allegations that were necessarily resolved in rejecting his IDEA claims." *Id.* at 973. Even if not precluded, it found that the claims failed as a matter of law because plaintiffs did not demonstrate a genuine issue of material fact that school officials acted in bad faith or with gross misjudgment. *Id.* (citing *B.M. ex rel. Miller v. South Callaway R-II Sch. Dist.*, 732 F.3d 882, 887 (8th Cir. 2013)).

Day alleges both discrimination and retaliation in violation of the ADA and Section 504. Because these claims are subject to a more demanding standard and are intertwined with her allegations that defendants did not follow the proper procedures under the IDEA and violated E.D.'s right to a FAPE, these claims are precluded by resolution of the IDEA claim. However, Day's allegations also fail to state a claim under these statutes. The retaliation provision of the ADA provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203. Retaliation requires proof that: (1) she engaged in statutorily protected activity; (2) that adverse action was taken against her and (3) a causal connection between the adverse action and protected activity. *Amir v. St. Louis University*, 184 F.3d 1017, 1025 (8th Cir. 1999). Taking Day's allegations as true, she fails to state a claim of retaliation

27

because there was no adverse action. She alleges she objected to or refused to sign the emergency seizure protocol drafted by Fagan and, as a result, the District made it a District-wide protocol. Neither she, nor E.D., were worse off by objecting to the emergency seizure protocol, as that protocol was put in place prior to Day's objections.

Day also fails to state a claim of discrimination under these statutes. As noted in *I.Z.M.*, Day must allege school officials acted in bad faith or with gross misjudgment. *See I.Z.M.*, 863 F.3d at 973. While Day does allege "gross negligence," based on failure to adhere to E.D.'s treating specialist's recommendations, *see* Doc. 5 at 9, she must also show that E.D. "was a qualified individual with a disability and that [s]he was denied the benefits of a program, activity, or services by reason of that disability." *Davis v. Francis Howell Sch. Dist.*, 138 F.3d 754, 756 (8th Cir. 1998). Day claims that E.D. was denied her right to FAPE (which was resolved by the IDEA claim). Nonetheless, she does not and cannot claim denial of FAPE based on discrimination because she removed E.D. from school after one instance in which E.D. was sent home after the administration of Diastat.[9] Day's allegations, taken as true, fail to state a claim of disability discrimination because she has not alleged facts demonstrating E.D. was denied a benefit based solely on her disability.

Nor has Day stated claims under Title IX or the ACA. For the reasons set forth above, she has failed to allege that E.D. was discriminated against on the basis of sex as required under Title IX,[10] and has failed to allege discrimination as part of a "health

---

[9] For the same reason, the school did not have the opportunity to provide reasonable accommodations under the ADA or Section 504 that may have been required if E.D. had been denied meaningful access to a benefit based on the emergency seizure protocol.

[10] Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

program or activity" under the ACA.[11]  Because the remaining claims under the ADA, Section 504, Title IX and the ACA are either precluded by resolution of the IDEA claim, or fail to state a claim under the applicable statutes, they are dismissed.

## V.    CONCLUSION

For the reasons stated herein:

1.    Defendants' motion (Doc. 25) to dismiss for failure to prosecute is **denied as moot**.

2.    The ALJ's decision is **affirmed** with respect to plaintiff's IDEA claim and all other claims are hereby **dismissed**.

3.    Judgment **shall enter** in favor of defendants and against plaintiff.

**IT IS SO ORDERED.**

**DATED** this 14th day of September, 2021.

_____
Leonard T. Strand, Chief Judge

---

[11] Section 1557 prohibits discrimination and the denial of benefits on the basis of race, color, national origin, sex, age or disability, "under any health program or activity, any part of which is receiving Federal financial assistance."  42 U.S.C. § 18116(a).  It expressly incorporates Title VI, Title IX, the ADEA and § 794 of Title 29.

29